IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| JAMES ALDRIDGE, RELATOR,<br>on behalf of<br>UNITED STATES OF AMERICA,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br><br>H. TED CAIN, JULIE CAIN,<br>CORPORATE MANAGEMENT, INC.,<br>a Mississippi corporation;<br>STONE COUNTY HOSPITAL, INC.,<br>THOMAS KULUZ, and STARANN LAMIER,<br><br>　　　Defendants. | )  CIVIL ACTION NO: 3:07CV309<br>)  HTW-LRA<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

This is the First Amended Complaint in a civil action brought by the United States,

as Plaintiff, against Defendants H. Ted Cain (Ted Cain), Julie Cain, Corporate

Management, Inc. (Management Company), Stone County Hospital, Inc. (the Hospital),

Thomas Kuluz, and Starann Lamier for Medicare fraud involving millions of dollars and

both factually and legally false claims, lasting over the course of more than a decade, and

continuing at present.[1]  This suit seeks damages, civil money penalties, and other relief

---

[1]　　　This First Amended Complaint adds Thomas Kuluz and Starann Lamier as defendants
and a payment as a mistake of fact claim against the Hospital.   It also adds factual allegations

1

under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended by the False Claims Act Amendments of 1986, the Fraud Enforcement and Recovery Act of 2009, Pub L. 111-21 (FERA), and the Patient Protection and Affordable Care Act of 2010, Pub. L. 111-148. This suit also seeks damages and other relief under the common law theories of payment by mistake of fact and unjust enrichment.

## **INTRODUCTION**

1.      At all times relevant to the allegations in this Complaint, Defendant Ted Cain has owned and controlled the Hospital and the Management Company named as Defendants in this case.

2.      Defendant Management Company oversees and manages the Hospital's business operations.  At all times relevant to the allegations in this Complaint, the Management Company acted as the agent of the Hospital.  Ted Cain is the Chief Executive Officer (CEO) of the Management Company and has been in that capacity at all times relevant to the allegations in this Complaint.  Defendant Julie Cain is Ted Cain's wife and was the administrator of the Hospital from 2003 through 2012.  In addition to the Hospital staff and Management Company employees, Ted Cain and Julie Cain purportedly managed the operations at the Hospital, although (as detailed below) they contributed little of value to this endeavor and nothing to justify their exorbitant salaries.

3.      Ted Cain has also owned and controlled several medical service and supply companies doing business with the Hospital as well as other medical and non-medical

---

about unnecessary and duplicative Hospital staffing in support of the claims.  The United States may amend as of right, per Fed.R.Civ.P. 15(a)(1)(B), as it is filing the First Amended Complaint prior to the receipt of a required responsive pleading.

businesses (collectively, the Related Businesses).  The Related Businesses are or were managed by the Management Company and, for over a decade, Defendants misallocated expenses to the Hospital from this network of Related Businesses that were not reimbursable by Medicare, thereby funneling millions of dollars in federal reimbursements to the Management Company from which Ted Cain received a multi-million dollar salary in many years.  Defendant Starann Lamier is the Management Company's Chief Operating Officer (COO)  She knew of and set up the overlapping and unnecessary management services provided by dozens of Management Company employees that duplicated the work of the Hospital staff and also the Hospital's business with the Related Businesses.

4.      There are, in the United States, approximately 1,300 to 1,400 small hospitals called Critical Access Hospitals, which generally operate in rural areas and are limited to a maximum of 25 hospital beds that can be used for either inpatient or "swing bed" services.[2]  *See* 42 C.F.R. § 485.620.  The Hospital is a Critical Access Hospital serving a rural area in Stone County, Mississippi.

5.      Medicare pays Critical Access Hospitals under a system different from that for paying most other hospitals.  Critical Access Hospitals receive 101 percent (101%) of Medicare's share of their reasonable and allowable costs for outpatient, inpatient, laboratory, and ambulance services, as well as for post-acute care ("swing bed" services).  *See* 42 C.F.R. §§ 413.70, 413.114.  In contrast, traditional hospital facilities are paid under

---

[2]      "Swing beds" is a reimbursement term that reflects a Critical Access Hospital's ability to use its beds interchangeably for either acute-care or post-acute skilled nursing care.  They are designed to offer care to patients who no longer need acute care, but do require additional inpatient services.

Prospective Payment Systems through which Medicare reimbursement is fixed and capped.  Medicare generally pays for the same medical services provided by a Critical Access Hospital as by other acute care hospitals, but Critical Access Hospital payments are based on each Critical Access Hospital's reasonable and allowable costs and the share of those costs allocated to Medicare patients.  Thus, as the costs increase, the Medicare reimbursement rates to Critical Access Hospitals also increase and, as these rates increase, so too do the Medicare reimbursements.

6.     The Medicare reimbursement rates for Critical Access Hospitals are computed for inpatient services as an average cost per day based on historical data multiplied by 101% and paid on an interim basis.  The Medicare reimbursement rates for Critical Access Hospitals are computed for outpatient services by multiplying the billed charge of each claim by the hospital's cost-to-charge ratio and then adding 1 percent (1%) to that amount.

7.     At all times relevant to the allegations in this Complaint, the Hospital submitted to Medicare cost reports that purportedly represented their actual and allowable costs incurred during that year, and the Medicare reimbursement rates were generally based on the actual and allowable costs reimbursed by Medicare from the prior year.

8.     As the management company of the Hospital and its agent, the Management Company gathered the information for the Hospital's Medicare costs reports and oversaw their preparation.  Defendant Tommy Kuluz is the Chief Financial Officer (CFO) of the Management Company.  At all times relevant to the allegations in the Complaint, Kuluz

4

and the Management Company knew of the information in the cost reports, knew of the falsity thereof, and concealed the fraud.

9. The Management Company, through Kuluz, also submitted home office cost statements to Medicare.  In the home office cost statements, the Management Company allocated the services that it allegedly provided to the Hospital.  Defendants Kuluz and Lamier signed some of the home office cost statements falsely certifying compliance with the applicable rules and regulations.  Medicare relied upon the  home office cost statements, as well as on the Hospital's cost reports, in determining the Hospital's reimbursement rates.

10. After the close of a fiscal year, the Hospital would submit its final Medicare cost report for that year and costs and payments were reconciled.  Medicare either reimbursed the Hospital for the actual and allowable costs that exceeded the interim payments made or Medicare collected excess payments from the Hospital if the actual and allowable costs were less than the interim payments.

11. At all times relevant to the allegations in this Complaint, Defendants fraudulently took advantage of Medicare's payment system for Critical Access Hospitals by, among other things, including in Medicare cost reports (*i.e.*, the false claims) fraudulent expenses relating to (1) Ted Cain's exorbitant, multi-million dollar salary that he paid himself for allegedly "managing" a small, 25-bed hospital with a full complement of professional staff also being reimbursed by Medicare to manage the hospital, (2) Julie Cain's quarter-million dollar annual salary for allegedly serving as the administrator of that same 25-bed hospital that Ted Cain was purportedly "managing," (3) two luxury cars,

5

a $68,000 BMW and an $88,000 BMW, that Ted Cain used as his own personal vehicles, that were not used or necessary to provide care to Medicare beneficiaries, and that are specifically excluded by regulations from Medicare reimbursement as luxury items, (4) Ted Cain's extensive network of related businesses unrelated to the care at the Hospital for Medicare beneficiaries, and (5) the overlapping and unnecessary management services provided by dozens of Management Company employees that duplicated the work of the Hospital staff.

12.    These fraudulent practices of overbilling and misallocation resulted in factually and legally false claims and false records and statements contained on the Medicare cost reports of the Hospital and the home office cost statements of the Management Company.  This fraud was so pervasive that it infected <u>every</u> cost report and statement that Defendants presented to Medicare from 2002 through the present.

13.     As a result of this scheme, Defendants caused Medicare to pay millions of dollars to the Hospital beyond what was reasonable and necessary for the management of a small, rural Critical Access Hospital.  This fraud is ongoing.

14.    A person with knowledge of a False Claims Act violation (a relator) may bring an action in federal district court (*qui tam* action) on behalf of the United States.  The relator in this case is James Aldridge.  In 2006, he worked as the Chief Operating Officer of the Hospital.  Prior to that time, in 2005 and 2006, Aldridge worked as the CEO of another small, rural hospital operated by the Management Company, Greene County Hospital (not a defendant in this case).  On or about May 31, 2007, he filed this *qui tam* action under

seal.  After investigating Aldridge's allegations, on August 3, 2015, the United States intervened and now files its own Complaint.

## VENUE AND JURISDICTION

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 31 U.S.C. § 3730.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).  Venue is proper in this District because Defendants transacted business here and some of the matters complained of occurred here.  *See* 31 U.S.C. § 3732(a).  In addition, a substantial part of the events giving rise to these claims occurred in this District, making venue proper under 28 U.S.C. § 1391(b).

## THE PARTIES

17.     Plaintiffs are the United States of America (United States or Government) and the relator, James Aldridge.  The United States files this Complaint on behalf of the Department of Health and Human Services (HHS) and the Centers for Medicare and Medicaid Services (CMS), formerly known as the Health Care Financing Administration (HCFA), on behalf of the Medicare program.

18.     Plaintiff James Aldridge is the relator in this case and the former CEO of Greene County Hospital and the former COO of the Hospital.  Aldridge has a bachelor's and a master's degree in health care administration.  He is an adult resident citizen of the State of Louisiana.

19.     Defendant H. Ted Cain is an adult resident of the State of Mississippi.  At all times relevant to the allegations in this Complaint, he has owned and controlled the

Management Company and the Hospital and has been the CEO of the Management Company.  At all times relevant hereto, Ted Cain has owned or controlled the Related Businesses.  Ted Cain can be served with process at his personal home last known to be located in Ocean Springs, MS 39564.

20.     Defendant Julie Cain, wife of H. Ted Cain, is an adult resident of the State of Mississippi.  She was the CEO of the Hospital from 2003 through 2012.  Julie Cain  can be served with process at her personal home last known to be located in Ocean Springs, MS 39564.

21.     Defendant Thomas Kuluz is an adult resident of the State of Mississippi. He has been employed at the Management Company from 1996 to June 2008 and then from January 2010 through the present, first as a controller and then as the CFO.  Thomas Kuluz can be served with process at 6900 Orchard Road, Ocean Springs, MS 39654.

22.     Defendant Starann Lamier is an adult resident of the State of Mississippi. She has been employed in a management capacity at the Management Company since 2004, initially for a short time as the regional director of operations and then as the COO. Starann Lamier can be served with process at 5062 Silver Ridge Drive, Kiln, MS 39556.

23.     Defendant Corporate Management, Inc. is a Mississippi corporation that, at all times relevant hereto, has been owned and operated by Ted Cain.  It is a management company that manages the Hospital, among other entities, and acts as the Hospital's agent, including with respect to the preparation of the Hospital's Medicare cost reports.  From  2002 to the present, the Management Company has also filed home office cost statements with Medicare relating to the

8

Hospital.  The Management Company can be served with process through its registered agent Robert Bass, at 11545 Old Highway, Gulfport, MS 39503.

24.     Defendant Stone County Hospital Inc., is a Mississippi corporation that, at all times relevant hereto, has been owned and controlled by Ted Cain.  The Hospital is a 25-bed Critical Access Hospital and has operated from 2001 to the present.  During that time, the Hospital has filed claims with Medicare for reimbursement for health care services provided to Medicare beneficiaries, and the Hospital has also filed cost reports with Medicare from 2002 to the present.  The Hospital can be served with process through its registered agent Robert Bass, at 11545 Old Highway, Gulfport, MS 39503.

## THE RELATED BUSINESSES OF TED CAIN

25.     The Management Company has more than 50 employees, manages many of the Related Businesses (listed below in ¶¶ 26-37), and receives millions of dollars in management fees each year from the Hospital and the Related Businesses.

26.     At all times relevant to the allegations in this Complaint, Ted Cain has owned and controlled Stone County Nursing and Rehabilitation Center, which is a nursing home that pays the Management Company annual management fees.

27.     At all times relevant hereto, Ted Cain has owned and controlled Stone County Rural Health Clinic, which is an outpatient clinic that pays the Management Company annual management fees.

28.     At all times relevant hereto, Ted Cain has owned and controlled Woodland Village Nursing Center, which is a nursing home that pays the Management Company annual management fees.

29.     At all times relevant hereto, Ted Cain has owned and controlled LTC Clinical Consulting, which is an entity that purports to provide education and training to other health care facilities owned or controlled by Ted Cain.

30.     Ted Cain owned and controlled Quest Medical, Inc., which was a medical supply company that paid the Management Company annual management fees.

31.     Ted Cain owned and controlled Quest Therapy, Inc., which provided a variety of physical, occupational, and speech therapy services.

32.     Ted Cain owned and controlled Quest Pharmacy, Inc., which was a pharmacy that paid the Management Company annual management fees.

33.     Ted Cain owned and controlled Quest Rehab, Inc., which provided speech therapy, physical therapy, and occupational therapy services and paid the Management Company annual management fees.

34.     In addition, Ted Cain has owned and controlled numerous non-healthcare businesses including Cain Cattle Company, Cain Cattle Beef, Inc.,  PlaneQuest, LLC, Quest Air, Inc., Quest Aviation Services, and Stone County Publishing.  The Management Company has performed services for these companies and received annual management fees from them.

35.     Through a management contract, Ted Cain and the Management Company controlled Greene County Hospital from 2005 through 2009.  This hospital is a Critical Access Hospital located in Mississippi that paid the Management Company annual management fees.

36.     Through a management contract, Ted Cain and the Management Company controlled Greene Rural Health Center from 2005 through 2009.  This entity is an outpatient

10

medical facility located in Mississippi that was managed by the Management Company and paid it annual management fees during this period.

37.    Through a management contract, Ted Cain and the Management Company controlled Greene County Nursing and Rehabilitation Center from 2005 through 2009.  This entity is a nursing home located in Mississippi that was managed by the Management Company and paid it annual management fees during this period.

## THE FALSE CLAIMS ACT

38.    The False Claims Act is the primary remedial statute designed to deter fraud upon the United States.  The Act was amended by FERA on May 20, 2009.  Given the nature of the claims at issue, in which the Defendants' misconduct spans from 2002 to the present, Sections 3729(a)(1), 3729(a)(2), and 3729(a)(7) of the prior (pre-FERA) statute, and Sections 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(G) of the revised (post-FERA) statute are relevant here.  The FERA amendments to the false statement provisions in the False Claims Act (31 U.S.C. § 3729(a)(1)(B)) were retroactive and apply to all of the claims at issue in this matter.  The FERA's other amendments were effective as of the date of enactment, May 20, 2009.  With respect to these non-retroactive amendments and as applied to this matter, the False Claims Act, as amended by the FERA, is largely consistent with the pre-FERA provisions of the Act, and thus, this Complaint cites the current version of the False Claims Act herein unless otherwise noted.

39.    As amended by the FERA, Section (a)(1) of the False Claims Act imposes civil liability, in pertinent part, upon any person, who in dealing with the Government,

11

either "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" . . . or "(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. §§ 3729(a)(1)(A),(B),&(G).

40.    In particular, subsection (a)(1)(A) of the False Claims Act imposes liability upon any person presenting, or causing to be presented, a false or fraudulent claim for payment or approval to the Government, including false or fraudulent cost reports presented, or caused to be presented, to Medicare by Defendants.

41.    Subsection (a)(1)(B) of the False Claims Act contains no presentment requirement to the Government.  Instead, it imposes liability upon any person who makes, uses, or causes to be made or used, a false record or false statement material to a false or fraudulent claim.  Here, to obtain inflated Medicare reimbursements, Defendants made and submitted to Medicare false records and statements in the Medicare cost reports and the Management Company's home office cost statements, including overbilling for the exorbitant and unwarranted salaries of Ted and Julie Cain and for Ted Cain's luxury BMW automobiles, inflating Ted Cain's working hours and misallocating those hours (and hence his salary) to the Hospital, and misallocating other unreasonable and unnecessary expenses to the Hospital.

42.     Subsection (a)(1)(G) is often referred to as the "reverse false claims" provision and imposes liability upon any person who withholds money owed to the Government or conceals an obligation to pay money owed to the Government, such as here for Defendants' failure to make proper adjustments to the Medicare cost reports that excluded all of the fraudulent, unreasonable and unnecessary expenses therefrom, their failure to reimburse Medicare for that overbilling, and their concealment of the improper expenses from the home office cost statements that Defendants submitted to Medicare in support of the cost reports.  As a result, Defendants knowingly, recklessly, and/or with deliberate ignorance thereto withheld millions of dollars that should have been reimbursed to Medicare.

43.     The False Claims Act defines the term "claim" to mean:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government-- (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contract or, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . .

31 U.S.C. § 3729(b)(2)(A) (emphasis added).

44.     The False Claims Act defines "knowing" and "knowingly" to include actual knowledge, deliberate ignorance, or reckless disregard and requires no proof of specific intent to defraud.  *See* 31 U.S.C. § 39(b)(1)(A),(B).  The term "material," as used in the

FCA, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *See* 31 U.S.C. § 3729(b)(4).

45.    As pertinent herein, the False Claims Act imposes liability of treble damages plus a civil penalty for each false claim in an amount not less than $5,500 and not more than $11,000.  *See* 31 U.S.C. § 3729(a)(1).

## THE MEDICARE PROGRAM AND COST REPORT
## SYSTEM FOR CRITICAL ACCESS HOSPITALS

46.    The United States, through HHS and its component agency, CMS, administers the Medicare program, including payments made on a beneficiary's behalf for inpatient and outpatient hospital services provided by a hospital that has entered into an agreement with the Secretary to participate in the Medicare program.  Section 1814(1) of the Social Security Act (42 U.S.C. § 1395f(1)) provides for payment of Part A, inpatient Critical Access Hospital services, and Section 1834(g) (42 U.S.C.§ 1395m(g)) provides for payment of Part B, outpatient Critical Access Hospital Services.  CMS pays Medicare bills, also called claims, received from hospitals such as the Hospital, and all such claims are paid with federal funds.

47.    Stone County Hospital is a Medicare provider.  As a participant in the Medicare Program, the Hospital is required to enter into agreements with CMS through "Medicare Enrollment Applications" on a form known as a "CMS-855A."  The Hospital executed a Medicare Enrollment Application with CMS in 2001, in which it certified on Form CMS-855A, through an authorized responsible officer, that it "understand(s) that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions . . .

14

and on the provider's compliance with all applicable conditions of participation in Medicare."

48.      As noted above, the Medicare Program designates certain hospitals as Critical Access Hospitals.  Critical Access Hospitals are typically small health care organizations that are located in rural communities with a limited employment and economic base.  Critical Access Hospitals receive federal reimbursement incentives designed to attract hospital providers to communities that would otherwise have difficulty receiving hospital care.

49.      Critical Access Hospitals are reimbursed differently by Medicare than other acute care hospitals.  Medicare provides federal reimbursement to Critical Access Hospitals for the reasonable and necessary actual costs, plus one percent, of inpatient care, outpatient care, laboratory costs ambulatory services, and post-acute care.

50.      In each year from 2002 to the present, the Hospital sought reimbursement for costs through its Medicare cost reports using CMS Form 2552.  At all times relevant to the allegations in this Complaint, HHS, through CMS, provided Medicare reimbursements for health care services provided to Medicare patients at the Hospital based on the cost reports submitted by the Hospital.

51.      Medicare has established regulations, rules and guidelines for the reporting of costs by Critical Access Hospitals in their Medicare cost reports.  *See* 42 C.F.R. pt. 413. To be properly reimbursable by Medicare, the costs reported on Medicare cost reports must directly relate to patient care.  *See* 42 C.F.R. § 413.9(a); CMS Pub. 15-1, Ch. 9, Sections 902.3 and 902.4.  Thus, Medicare providers may include in their Medicare cost reports only those expenses associated with providing medically necessary and reasonable care.  *See id.*  Similarly,

15

costs "flowing from the provision of luxurious items or services" are not allowable. 42 C.F.R. § 413.9(c)(3). Moreover, Medicare limits a Critical Access Hospital's reimbursement "if a particular institution's costs are found to be substantially out of line with other [similar] institutions." *See* 42 C.F.R. § 413.9(c)(2).

52.     Also, compensation for any services provided by the owner of a Medicare provider is allowable as a proper Medicare cost only to the extent that the services are actually performed in a necessary function directly related to patient care and only to the extent that the compensation is in an amount that would ordinarily be paid for comparable services by comparable institutions. Costs are reasonable if actually incurred and necessary and proper to the rendering of services. *See* 42 C.F.R. § 413.13(a); CMS Pub. 15-1, § 2100.

53.     Given the importance of truthful and accurate cost reports in the Medicare program, Medicare cost reports (CMS Form 2552) presented by Critical Access Hospitals contain a certification, as follows: "MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT" (emphasis in original).

54.     Medicare cost reports (CMS Form 2552) presented by Critical Access Hospitals also contain an additional certification, in accord with 42 C.F.R. § 413.24

(f)(4)(iv), entitled "Certification By Officer Or Administrator Of Provider(s)," which states as follows:  "I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations" (emphasis in original).

55.    Medicare relies on the information disclosed in the Medicare cost reports in determining the reimbursement rates and the amounts paid to the Hospital.  CMS Form 2552 makes this clear by stating "This report is required by law (42 U.S.C. 1395g; 42 CFR 413.20(b)).  Failure to report can result in all interim payments made since the beginning of the cost reporting period being deemed overpayments (42 USC 1395g)" (parentheticals in original).  The representations as to the costs reflected in the Medicare cost reports are presumed by Medicare to be truthful, accurate, and allowable under the applicable Medicare laws and regulations.  These representations are material to, and indeed (via the certifications listed above) are a condition of Medicare reimbursement.

## THE MANAGEMENT COMPANY'S HOME OFFICE COST STATEMENTS

56. The Management Company oversees the operations of the Hospital and the Related Businesses of Ted Cain. At all times relevant to the allegations in this Complaint, the Management Company acted as the agent of the Hospital. Because some, but not all, of the Management Company's clients (such as the Hospital) are Medicare providers, the Management Company must also file with Medicare periodic CMS Forms 287 even though it is not a Medicare provider. As noted above, these forms are called "home office cost statements." In them, the Management Company allocates the allowable costs for health care services directly related to patient care that the Management Company performed for various individual providers, plus an appropriate share of indirect costs (*e.g.*, overhead, rent for home office space, administrative salaries) to the extent they are reasonable and included in the various providers' cost reports and are reimbursable as part of those providers' costs. On the CMS Forms 287, the Management Company was and is required to show the total costs incurred for the year for its services directly related to patient care and truthfully and accurately allocate among its health care clients, including but not limited to Medicare providers, the amount of management expenses attributable to each.

57. In allocating management expenses incurred on behalf of Medicare providers, the Management Company must allocate only the amount of such expenses directly related to patient care and only to the extent those expenses are reasonable. *See* 42 C.F.R. § 413.9; CMS Pub. 15-1, Ch. 9, Sections 902.3 and 902.4. The Management Company is not permitted to allocate to any Medicare provider any costs incurred by, or

18

on behalf of, a non-Medicare entity or a non-Medicare patient. *See id.* To do otherwise would result in Medicare improperly paying for costs unrelated to the care of Medicare beneficiaries.

58.     The home office cost statements (CMS Form 287) presented to Medicare by the Management Company contain similar certifications as those in the Medicare cost reports submitted by the Hospital.  In particular, the certification and the statement set forth in ¶¶ 53 and 55 respectively are the same in the home office cost statements as in the Medicare cost reports.  The Medicare cost report certification set forth in ¶ 54 is a little different than the home office cost statement certification.  This reflects the different materials required to be filed in each document.  The certification for the home office cost statement (CMS Form 287) states as follows: "I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying Statement of Allowable Home Office Costs (and equity capital, if applicable), the allocation thereof to the chain components, and the other supporting schedules for the period beginning [date] and ending [date] and to the best of my knowledge and belief, they are true and correct statements prepared from the books and records of the home office in accordance with applicable instructions, except as noted (attach statement with exceptions, if necessary)" (emphasis and parentheticals in original).

59.     Medicare relies on the information disclosed in the home office cost statements in determining the reimbursement rates and the amounts paid to the Hospital. The representations as to the costs reflected therein are presumed by Medicare to be truthful, accurate, and allowable under the applicable Medicare laws and regulations.  These

representations are material to, and indeed (via the certifications made therein) are a condition of Medicare reimbursement.

## OVERVIEW OF THE ONGOING FRAUDULENT SCHEME

60.     At all times relevant to the allegations in this Complaint, Defendants Ted Cain, Julie Cain, Thomas Kuluz, Starann Lamier, the Management Company, and the Hospital have engaged in a fraudulent scheme in which they submitted or caused the submission to Medicare of falsely certified cost reports and home office cost statements to obtain inflated and improper Medicare reimbursements.  As detailed further below, these Defendants abused the special Medicare rules for Critical Access Hospitals by improperly claiming expenses for the Cains' excessive and unwarranted compensation for work not performed and for Ted Cain's personal luxury automobiles on the Hospital's Medicare cost reports, misallocating expenses of the Management Company to the Hospital, overcharging for unnecessary and duplicative costs of the Management Company and the Related Businesses, and submitting and causing the submission of false records and statements, including the CMS Forms 2552 and the CMS Forms 287, to Medicare claiming reimbursement for and concealing these false and fraudulent expenses.

61.     From at least 2002 to the present, the Management Company engaged outside accounting firms to prepare the Medicare cost reports for the Hospital and the home office cost statements of the Management Company.  Upon information and belief, the outside accounting firms were King & Associates between 2002 and 2004, DiPiazza LaRocca McDowell & Co. (DLMC) from 2005 through 2011, and BKD LLP thereafter.  As detailed below, the Management Company provided these outside accounting firms with the

information for the Medicare cost reports and the home office cost statements, and these firms did not audit, review or otherwise check the truthfulness or accuracy of this information in preparing the Medicare cost reports and the home office cost statements.

62.    At an investigative deposition in this case taken on December 16, 2014, Anthony LaRocca, an accountant at DLMC, testified that Tommy Kuluz, the Management Company's Chief Financial Officer, was his primary contact with respect to the cost reports and home office cost statements, and that Kuluz provided DLMC with the cost adjustments and allocations, which DLMC then simply added to the reports without additional analysis. LaRocca also testified that the Management Company filed the cost reports and home office cost statements.

63.    At all times relevant to the allegations in this Complaint, Kuluz and the Management Company, as agents of the Hospital, knew of the falsity of these fraudulent expenses and misallocations and concealed the fraud from these outside accounting firms by providing them with false or fraudulent  information and by withholding truthful and other material information from them.

64.    As a result of this scheme, the Medicare reimbursements (both the amount of reimbursements and the daily reimbursement rates) to the Hospital increased substantially between 2002 and the present without any corresponding increase in the amount of patient care.  With respect to reimbursement rates, the daily hospital bed rates (*i.e.,* the fixed amount paid per day by Medicare for the hospital care of Medicare inpatients) at the Hospital reflect the impact of these exorbitant costs and expenses on Medicare reimbursements.  According to Stroudwater & Associates (Stroudwater), a

health care consultant hired in 2006 by Ted Cain and the Management Company to review operations at the Hospital, the 2005 inpatient bed rate for the Hospital vastly "exceeds the 75th percentile of peer [Critical Access Hospitals] due to a relatively high room rate of [approximately] $1,200 compared to an average of $350 - $450/day." Relator Aldridge observed Ted Cain and Tommy Kuluz, among others, closely reviewing the Stroudwater report, but noted it was kept secret from the Hospital staff.

## THE DUPLICATIVE AND UNNECESSARY HOSPITAL STAFFING

65.     One means by which Defendants Ted Cain, Julie Cain, Thomas Kuluz, Starann Lamier, the Management Company, and the Hospital improperly increased Medicare reimbursements was through the duplicative and unnecessary Hospital staffing, which impacted the costs reported by the Hospital on its Medicare cost reports and by the Management Company on its home office cost statements.

66.     From 2002 to the present, the Hospital, a facility with only 25 beds, has employed an extensive and growing staff over time of full-time managers on site at the Hospital, including, among others at various times and under the direction of Starann Lamier since 2004, a Chief Operations Officer, Chief Financial Officer, Human Resources Director, Nursing Director, Quality Director, and Chief of Staff, all of whom received salaries included in the Hospital's Medicare cost reports. Additionally, the Hospital paid millions of dollars in fees to the Management Company for similar overlapping and duplicative services, also under the direction of Lamier since 2004, as those performed by the Hospital staff, including performing redundant operations, financial, and human resource functions. Lamier knew of and indeed set up the duplicative Hospital staffing

22

that included numerous Hospital and Management Company staff performing overlapping and unnecessary functions.  At her investigative deposition, for example, Lamier admitted that 25 to 30 Management Company staff worked on Hospital matters in addition to a full complement of Hospital staff.  Lamier also admitted that Ted Cain's other health care businesses, that were not reimbursed by Medicare, employed few staff and had limited oversight by the Management Company.  Julie Cain also interviewed Hospital staff, was aware of the staffing at the Hospital and and Management Company, and knew of or recklessly disregarded the duplicative and overlapping nature of this staffing.

67.     These duplicative and unnecessary services of the Management Company were included on the Medicare cost reports overseen by Kuluz and drove up overall costs, thereby raising bed rates and the rates for other services.  In particular, the Hospital paid the Management Company fees of $1,242,942 in 2004; $1,971,055 in 2005; $2,572,486 in 2006; $3,055,913 in 2007; $2,554,731 in 2008; $3,707,985 in 2009; $1,956,668 in 2010; $2,045,766 in 2011; $2,474,097 in 2012; and $2,533,943 in 2013.[3]

68.     At all times relevant to the allegations in this Complaint, Defendants Ted Cain, Julie Cain, Thomas Kuluz, Starann Lamier, the Management Company, and the Hospital (acting through its agent, the Management Company) acted with actual knowledge, reckless disregard, or deliberate indifference regarding the falsity of these

---

[3]     Defendants have not produced complete documentary information for Ted Cain's excessive compensation in 2002 and 2003 and Julie Cain's excessive compensation in 2002. Nor have they produced any documentation relating to 2014 and hence the figures cited above do not include such amounts.  Hence, the Hospital's fees paid to the Management Company have not been estimated for those years.

expenses for duplicative and unnecessary Hospital staffing that were reported in the Medicare cost reports and the home office cost statements.

69.     Medicare relied upon the certifications in the Hospital's Medicare cost reports (CMS Forms 2552) and the Management Company's home office cost statements (CMS Forms 287, some of which were signed by Kuluz and Lamier) that these reports included only reasonable, necessary, and allowable expenses relating to Hospital staffing in the care of Medicare beneficiaries.  The representations in the Hospital's Medicare cost reports and the Management Company's home office cost statements were material to Medicare's decision to reimburse those costs and had a natural tendency to influence and did influence those decisions.

## THE EXCESSIVE COMPENSATION OF TED CAIN

70.     Another means by which Defendants Ted Cain, Thomas Kuluz, the Management Company, and the Hospital improperly increased Medicare reimbursements was through Ted Cain's excessive compensation, which also impacted the costs reported by the Hospital on its Medicare cost reports and by the Management Company on its home office cost statements.

71.     Despite the voluminous and overlapping Hospital staff described above, Ted Cain received an annual salary from the Management Company (as detailed *infra* at ¶ 81) ranging from approximately $1,000,000 in 2004 to more than $3,300,000 in 2009, and then down to approximately $2,000,000 thereafter.  Much of this compensation was paid for by Medicare through the Hospital's cost reports and the Management Company's home office cost statements.

24

72.     Between 2004 and 2008, the Management Company's internal working papers relating to Ted Cain's "owner compensation" indicated that he allegedly worked 65 hours per week on health care matters in total and spent approximately 80% of his time (*i.e.*, over 50 hours per week) on purported work for the Hospital.  These working papers reflect the amount of Ted Cain's alleged working time allocated from the Management Company, on its home office cost statements, to the Hospital between 2004 and 2008.  At his investigative deposition in this case taken on October 8, 2014, Ted Cain testified, among other things, to having worked at least 50 hours per week on Hospital matters and 65 hours per week overall on health care matters for many years, to overseeing the financial operations of the Hospital, and to reviewing accounting and financial records, including the cost reports of the Hospital and the home office cost statements of the Management Company.  Reports filed with the State of Mississippi Division of Medicaid (but not with the Federal Government) covering the periods 2004 through 2008 for two of the Related Businesses, Stone County Nursing and Rehabilitation Center and Woodland Village Nursing Center, also describe Ted Cain as performing those same functions and set forth his multi-million dollar compensation during those periods from the Management Company.

73.     Ted Cain also testified that Thomas Kuluz, on behalf of the Management Company, prepared these internal working papers and oversaw the preparation of the cost reports and provided the information relating thereto to the outside accountants who prepared, but did not file, the cost reports for the Hospital and the Management Company.  While Ted Cain claimed at his deposition not to recall whether or not he reviewed these internal working papers relating to "owner compensation," Kuluz, at his investigative deposition in this case taken on October 10, 2014, testified that he prepared these working papers, admitted setting the owner

compensation allocated to the Hospital on its cost reports based on the purported hours worked by Ted Cain (*i.e.*, the 80% allocation), and recalled discussing owner compensation numerous times with Ted Cain. Kuluz also testified that he provided the Medicare cost report information and allocations from the home office to the outside accountants and oversaw the process by which the outside accounting firms prepared the Medicare cost reports and home office cost statements.

74.     Based on the foregoing, Ted Cain, Thomas Kuluz, the Management Company, and the Hospital, with actual knowledge, reckless disregard, and/or deliberate ignorance, allocated and caused the Management Company to allocate on its home office cost statements approximately 80% of his compensation to the Hospital between 2004 and 2008. That works out to over 50 hours per week that Ted Cain allegedly spent working at the Hospital between 2004 and 2008. Also, the Management Company allocated about 69% of Ted Cain's compensation to the Hospital in 2009. Between at least 2004 through 2009, these fraudulent expenses resulted in grossly excessive charges on the Hospital's cost reports and came from misallocations on the Management Company's home office cost statements and the Hospital's cost reports.

75.     Also, at the same time that Ted Cain represented to Medicare that he worked more than 65 hours per week on health care matters and more than 50 hours per week on Hospital matters, he represented to the Internal Revenue Service (IRS) on his tax returns, between 2004 and 2009,  that he worked over 500 hours each year for other entities (*i.e.*, not the Hospital or Management Company) owned by him. These representations to the IRS enabled Ted Cain to claim losses used to offset the taxes on his exorbitant

compensation from the Management Company.  The combined hours Ted Cain claims to have worked, through his representations to Medicare and the IRS, exceeded 3,800 hours per year (*i.e.,* more than 10.5 hours per day for 365 days per year).

76.     The United States notified the Defendants of its investigation on or about March 2010.  Thereafter, in 2010, the Management Company changed its allocation method from direct allocation (based on Ted Cain's purported actual working time) to a pooled allocation (not based on actual working time, but instead based on operating expenses (*i.e.*, the ratio of the Hospital's operating expenses to the total operating expenses of all of Ted Cain's health care companies)).  Under the pooled allocation method, each year from 2010 to the present, the allocation of Ted Cain's salary to the Hospital was substantially reduced (although still grossly overstated), with approximately 45% of his salary from the Management Company allocated to the Hospital.  Between 2010 and the present, these fraudulent expenses resulted in grossly excessive charges on the Hospital's cost reports and came from misallocations on the Management Company's home office cost statements and the Hospital's cost reports.

77.     At all times relevant to the allegations in this Complaint, Ted Cain, Thomas Kuluz, the Management Company, and the Hospital, with actual knowledge, reckless disregard, and/or deliberate ignorance, made false representations concerning the time that Ted Cain purportedly spent working on Hospital matters.  Rather than working long hours relating to the Hospital, these Defendants knew that Ted Cain spent substantial time managing his Related Businesses and conducting his personal hobby of raising cattle and managing a cattle farm, all of which were also managed by the Management Company.

27

These Defendants also knew that Ted Cain did not spend anywhere close to the time on Hospital matters that was allocated to Medicare on the CMS Forms 2552 and the CMS Forms 287.  In addition, any such services for the Hospital purportedly performed by Ted Cain and allocated to Medicare on that basis duplicated the management services performed by the Management Company and Hospital staff, lacked substantial value, or should have been performed by administrative staff and thus were unreasonable and unnecessary expenses.

78.    Indeed, virtually no documentation exists relating to Ted Cain's purported work at the Hospital.  There are no documents showing any work; he kept no notes; there are no time sheets; and he did not even keep a file cabinet in his office.  At his investigative deposition in this case, Ted Cain did not dispute this lack of documentation relating to his purported work at the Hospital and admitted that he did not run the Hospital's day-to-day business or medical operations, but instead relied upon the Management Company and Hospital staff.  He also admitted that, after the change to the pooled allocation method of  accounting, he went to the Hospital infrequently over the "[l]ast couple of years, maybe three or four times a month" and that at those times he "[j]ust look[s] around" and "occasionally" may "sit in on meetings," but admits "I'm not directing any meetings."

79.    Additionally, Ted Cain could not articulate, at his investigative deposition, any specific work that he performed or duties that he held at the Hospital other than reviewing financial documentation and overseeing the Management Company, which in turn oversaw and worked with the hospital staff at the Hospital.  Ted Cain testified that his

primary contact relating to the Hospital was Defendant Starann Lamier, the Management Company's Chief Operating Officer.  But Lamier has no notes, emails, or documents showing any such oversight by Ted Cain.  As detailed above, Lamier oversaw the Hospital staff, led by Robert Bass (among others at various times).  Bass also has no notes, emails, or documents showing any involvement of Ted Cain.  Additionally, Ted Cain testified that he attended meetings (but no notes, emails, or meeting minutes from him or others reflect any such attendance) and that he opened the mail (an administrative function).

80.     In his capacity as Chief Operating Officer of the Hospital during 2006, the relator, James Aldridge, saw Ted Cain at the facility just sporadically during the lunch hour, did not observe him working in a managerial capacity at the Hospital, and did not have any substantial management communications with him either on or off the Hospital site.  Similarly, at an investigative deposition taken on December 6, 2013, Eric Shell, CPA, the lead accountant working on the 2006 Stroudwater report, testified that he never observed Ted Cain at the Hospital, described Cain as "the man behind the curtain," and noted that, while he often discussed operational matters with CEOs of Critical Access Hospitals in compiling similar reports, he never even spoke with Ted Cain during the compilation of the Hospital's report but instead discussed business operations with Management Company employees like Kuluz and Lamier.

81.     Despite Ted Cain's lack of meaningful work at the Hospital, the amount of his compensation (from 2004 through 2013) paid by the Management Company, allocated to the Hospital, and reimbursed by Medicare, pursuant to the Hospital's CMS Forms 2552 and the Management Company's CMS Forms 287, was as follows:

29

| | Ted Cain's Compensation Paid by Management Company | Ted Cain's Compensation Allocated to the Hospital | Ted Cain's Compensation Reimbursed by Medicare |
|---|---|---|---|
| 2002 | * | * | * |
| 2003 | * | * | * |
| 2004 | $1,027,766 | $907,649 | $754,458 |
| 2005 | $1,910,621 | $1,649,030 | $1,251,701 |
| 2006 | $2,434,652 | $2,087,471 | $1,537,808 |
| 2007 | $2,853,261 | $2,493,553 | $1,749,965 |
| 2008 | $1,883,662 | $1,685,558 | $1,067,258 |
| 2009 | $3,317,314 | $2,796,045 | $1,750,679 |
| 2010 | $2,036,817 | $900,638 | $565,558 |
| 2011 | $1,868,705 | $836,931 | $539,377 |
| 2012 | $1,998,833 | $868,590 | $563,027 |
| 2013 | $2,052,833 | $988,839 | $629,234 |
| | $21,384,465 | $15,214,304 | $10,409,063 |

* Figures not determined due to missing documentation

82.    At all times relevant to the allegations in this Complaint, Ted Cain's compensation grossly exceeded the average compensation of CEOs who manage services at Critical Access Hospitals--in some years on the order of 10:1 or more.  Based on 2012 data from the National Rural Healthcare Association, the average compensation of CEOs at small Critical Access Hospitals (with net patient revenues less than $20 million), like the Hospital, ranged from

30

$120,000 at the 25th percentile to $160,500 at the 75th percentile.  Also, a 2007 survey by

the IRS estimated the median and average CEO compensation at Critical Access Hospitals

as $161,400 and $177,600, respectively.  In addition, at an investigative deposition taken

on December 6, 2013, the lead Stroudwater accountant, Shell, described as "very high" the

amount of Ted Cain's compensation allocated to the Hospital and testified that Stroudwater

"never saw Ted Cain's salary" or otherwise learned of his high compensation and never

saw any of the allocations between the Hospital and the Management Company.

83.     Medicare reimbursement for salaries paid to the owners of Critical Access

Hospitals is not prohibited, but it is limited by law.  Medicare requires that owner compensation

be both reasonable and necessary, as set out in *See* 42 C.F.R. § 413.9; CMS Pub. 15-1, Ch. 9,

Sections 902.3 and 902.4.  To be considered "reasonable," and thereby reimbursable by

Medicare, "the compensation allowance [must] be such an amount as would ordinarily be

paid for comparable services by comparable institutions depending upon the facts and

circumstances of each case." (Section 902.3).  "Necessary means that had the owner not

furnished the services, the institution would have had to employ another person to

perform those services.  The services must be pertinent to the sound conduct and

operation of the institution." (Section 902.4).

84.     At all times relevant to the allegations in this Complaint, Defendants Ted

Cain, Thomas Kuluz, the Management Company, and the Hospital (acting through its

agent, the Management Company) acted with actual knowledge, reckless disregard, or

deliberate indifference regarding the falsity of these expenses.  These Defendants also

concealed the fraud from the outside accounting firms that prepared the Hospital's cost

reports and the Management Company's home office cost statements by providing those firms with false or fraudulent  information and withholding other truthful and material information from them.

85.   In particular, these Defendants knew that the amount of Ted Cain's salary allocated to the Hospital was "unreasonable." In addition, these Defendants knew the fraudulent nature of Ted Cain's alleged services for and working hours at the Hospital being allocated to Medicare via the Hospital's Medicare cost reports (CMS Form 2552) and the Management Company's home office cost statements (CMS Form 287), including that these services were not being performed by Ted Cain and, in any event, were not "necessary" for the care of Medicare beneficiaries.  These Defendants also knowingly concealed this fraud from the outside accounting firms who prepared the Medicare reports and statements.

86.   Medicare relied upon the certifications in the Hospital's Medicare cost reports (CMS Forms 2552) and the Management Company's home office cost statements (CMS Forms 287, some of which were signed by Kuluz) that these reports included only compensation that was reasonable, necessary, and allowable relating to the care of Medicare beneficiaries.  The representations, in the Hospital's Medicare cost reports and the Management Company's home office cost statements were material to Medicare's decision to reimburse those costs and had a natural tendency to influence and did influence those decisions.

## TED CAIN'S PERSONAL BMW VEHICLES

87.   As noted above, to be reimbursable by Medicare, costs must be reasonable and necessary, as well as related to the care of Medicare beneficiaries.

32

88.    The Hospital's Medicare cost reports and Management Company's home office cost statements from 2002 through 2009 included depreciation costs and other expenses associated with a 1997 BMW automobile purchased by Ted Cain for $68,330 and with a 2007 BMW automobile purchased by Ted Cain for $88,393.  Ted Cain used these BMWs as his personal vehicles, and they were not used to provide services to Medicare beneficiaries.  Furthermore, Medicare regulations expressly disallow any reimbursement for luxury items, such as BMW automobiles.  *See* 42 C.F.R. § 413.9(c)(3).

89.    Nevertheless, the purchase price, depreciation, insurance, fuel, repair, and maintenance associated with these luxury vehicles were impermissibly included in the Medicare cost reports in the amount of $8,193 in each year from 2002 through 2009 and Medicare reimbursed the following amounts for these false or fraudulent expenses: $6,173 in 2002; $6,739 in 2003; $6,743 in 2004; $6,133 in 2005; $5,955 in 2006; $5,676 in 2007; $5,136 in 2008; and $5,079 in 2009, for a total of $47,635 in unallowable expenses for these luxury vehicles.

90.  At his investigative deposition in this case, Thomas Kuluz admitted to knowing that expenses relating to Ted Cain's BMWs were included in the Medicare cost reports and that the individual employees using these vehicles (*i.e.*, Ted Cain regarding the BMWs) kept track of the expenses.  Based on the foregoing, Defendants Ted Cain, Thomas Kuluz, the Management Company, and the Hospital, with actual knowledge, reckless disregard, and/or deliberate ignorance, fraudulently sought Medicare reimbursements for depreciation costs and other expenses associated with luxury automobiles that were unreasonable, unnecessary, and unallowable.  Upon learning of the

United States' investigation in 2010, these Defendants stopped seeking these Medicare reimbursements for the BMWs.

91.    Medicare relied upon the certifications in the Hospital's Medicare cost reports (CMS Forms 2552) and the Management Company's home office cost statements (CMS Forms 287, some of which were signed by Kuluz) that these reports included only those depreciation costs and other vehicle expenses that were reasonable, necessary, and allowable relating to the care of Medicare beneficiaries.  The representations, in the Hospital's Medicare cost reports and the Management Company's home office cost statements were material to Medicare's decision to reimburse those costs and had a natural tendency to influence and did influence those decisions.

## JULIE CAIN'S EXCESSIVE COMPENSATION

92.    Another means by which Defendants improperly obtained excessive Medicare reimbursements was through the exorbitant compensation of Julie Cain.

93.    At all times relevant to the allegations in this Complaint, Julie Cain has been Ted Cain's wife.  She has no formal education or training in hospital management.  Nevertheless, beginning in or around 2003, Julie Cain was given the title of administrator at the Hospital and received hundreds of thousands of dollars in salary paid by the Hospital and the Management Company, and reimbursed by Medicare pursuant to the Hospital's CMS Forms 2552 and the Management Company's CMS Forms 287, for her supposed services, as follows:

34

| | Julie Cain's Compensation Paid by the Hospital | Payroll & Benefits Paid by Mgmt. Company to Julie Cain | Director Fees Paid by Mgmt. Company to Julie Cain | Julie Cain's Total Compensation | Julie Cain's Compensation Reimbursed by Medicare |
|---|---|---|---|---|---|
| 2003 | $153,458 | - | - | $153,458 | $127,484 |
| 2004 | $198,917 | - | - | $198,917 | $165,344 |
| 2005 | $201,000 | - | - | $201,000 | $151,978 |
| 2006 | $251,000 | - | - | $251,000 | $184,274 |
| 2007 | $251,000 | - | - | $251,000 | $175,628 |
| 2008 | $250,000 | - | - | $250,000 | $158,294 |
| 2009 | $251,000 | - | - | $251,000 | $157,158 |
| 2010 | $276,917 | - | - | $276,917 | $173,891 |
| 2011 | $279,000 | - | - | $279,000 | $179,807 |
| 2012 | $200,000 | $75,070 | $22,400 | $297,470 | $157,097 |
| 2013 | - | $111,297 | $22,400 | $133,697 | $40,981 |
| | $2,312,292 | $186,367 | $44,800 | $2,543,459 | $1,671,935 |

94.     As noted above (¶ 82), during the relevant time period, the total compensation of CEOs at small Critical Access Hospitals, like the Hospital, were in the range of $120,000 - $177,600.

95.     Notwithstanding this exorbitant compensation that she received as set forth above, Julie Cain did not function as an administrator at, or provide valuable management services to, the Hospital.  Rather, the Hospital's daily operations were overseen by

35

Starann Lamier, who knew of or recklessly disregarded Julie Cain's excessive compensation.  Also, the Hopsital's daily operations were carried out by the numerous Hospital staff (whose salaries were also paid by Medicare), and by the employees of the Management Company (which received management fees for the services of its employees to the Hospital, which were allocated to and reimbursed by Medicare).  To the extent that Julie Cain performed any services at all, they overlapped with the services performed by other staff.

96.    In his capacity as Chief Operating Officer of the Hospital during 2006, the relator, James Aldridge, knew who was physically present at the hospital and who was responsible for management decisions made in furtherance of the hospital's day-to-day medical and business operations.  Aldridge rarely saw Julie Cain at the Hospital, and he did not observe her operating in any managerial capacity on behalf of the hospital.  Also, as with Ted Cain, Aldridge did not have any substantial management communications with Julie Cain either on or off the Hospital site.  Rather than reporting to Julie Cain, Aldridge was instructed to report to Starann Lamier of the Management Company.

97.    Each of the Defendants named herein knew that as an employee of the Hospital, Julie Cain's salary was reimbursed by Medicare via the Hospital's cost reports and also knew that her salary was unreasonable because Julie Cain did not perform any meaningful work at the Hospital and that any such services for the Hospital that she purportedly performed duplicated the management services performed by the Management Company and the Hospital staff, lacked substantial value, and/or should have been performed by administrative staff and thus represented unreasonable and unnecessary expenses.

36

98.     The Management Company, as an agent of the Hospital, also paid Julie Cain so-called "director fees" in 2012 and 2013.  On its home office cost statements, the Management Company certified that Julie Cain was paid $22,400 in 2012 and an additional $22,400 in 2013 for purported directors' services.  Yet, at her investigative deposition in this case taken on October 9, 2014, Julie Cain admitted that she could not identify any directors' meetings or work that she had performed for those fees.  In addition, the documentary record does not reflect any director's meetings attended by Julie Cain.  Because Julie Cain did nothing meaningful to earn these director fees, they were not reasonable or necessary and thus were unallowable on the Management Company's home office cost statements.

99.     In addition to her salary at the Hospital and the director fees from the Management Company, Julie Cain received a salary as an employee of the Management Company in the amount of $75,070 in 2012 and $111,297 in 2013.  On the home office cost statements for the Management Company, part of her compensation was allocated to the Hospital, as set forth in the table above (*see* ¶ 93), and improperly included in the Hospital's cost reports for those years.

100.     At her investigative deposition in this case, Julie Cain claimed that she had performed consulting services for the Management Company, but could not identify any such consulting services or any times that she performed them.  In addition, the documentary record does not reflect Julie Cain doing any consulting for the Hospital or otherwise.  Because Julie Cain did not provide any meaningful services to support this compensation, the portion of her Management Company compensation that was allocated to Medicare on the Hospital's cost

reports (CMS Forms 2552) and on the Management Company's home office cost reports (CMS Forms 287) was false or fraudulent.

101.    At all times relevant to the allegations in this Complaint, each of the Defendants named herein acted with actual knowledge, reckless disregard, or deliberate indifference regarding the falsity of these expenses relating to Julie Cain's purported services at the Hospital.  These Defendants also concealed the fraud from the outside accounting firms that prepared the Hospital's cost reports and the Management Company's home office cost statements by providing those firms with false or fraudulent information and withholding other truthful and material information from them.

102.    Medicare relied upon the certifications in the Hospital's Medicare cost reports (CMS Forms 2552) and the Management Company's home office cost statements (CMS Forms 287, some of which were signed by Kuluz and Lamier) that these reports included only compensation that was reasonable, necessary, and allowable relating to the care of Medicare beneficiaries.  These representations, in the Hospital's Medicare cost reports and the Management Company's home office cost statements were material to Medicare's decision to reimburse those costs and  had a natural tendency to influence and did influence those decisions.

## SUMMARY OF THE FALSE CLAIMS

103.    Based on the foregoing, Defendants Ted Cain, Julie Cain, Thomas Kuluz, Starann Lamier, the Management Company, and the Hospital submitted or caused to be submitted false or fraudulent claims and false or fraudulent records or statements to Medicare via the

fraudulently inflated Medicare cost reports of the Hospital and home office cost statements of the Management Company.

104.    In particular, the Hospital presented false or fraudulent cost reports (CMS Forms 2552) to Medicare on or about at least the following dates:  May 28, 2003; July 23, 2003; May 28, 2004; June 17, 2004; May 28, 2005; June 1, 2006; May 31, 2007; May 29, 2008; May 27, 2009; November 9, 2009; June 21, 2011; May 31, 2012; June 15, 2012; June 4, 2013; and June 2, 2015.  Similarly, the Management Company submitted false or fraudulent home office cost statements (CMS Forms 287) to Medicare on or about at least the following dates:  May 17, 2005; May 26, 2006; May 25, 2007; May 29, 2008; May 29, 2009; June 10, 2010; May 27, 2011; May 31, 2012; May 30, 2013; and May 27, 2014.

105.    Defendants knowingly inflated the Hospital cost reports to bilk Medicare for excessive and fraudulent expenses in at least the following amounts (including the fraudulent compensation to the Cains and the costs of the BMWs, but not the excessive management expenses caused by the duplicative and unnecessary Hospital staffing), as follows: $6,173 in 2002; $134,223 in 2003; $926,545 in 2004; $1,409,812 in 2005; $$1,728,037 in 2006; $1,931,269  in 2007; $1,230,688 in 2008; $1,912,916 in 2009; $739,449 in 2010; $719,184 in 2011; $720,124 in 2012; and $670,215 in 2013.  *See supra* ¶ 67 & n. 3 regarding the documentary limitations of these figures due to missing information for 2002, 2003, and 2014.

106.    The Hospital cost reports (CMS Forms 2552) presented to Medicare were all signed by "officers or administrators" of the Hospital, including but not limited to Allen Gamble and James Williams (both Chief Operating Officers of the Hospital at different times) and falsely certified to the truth and accuracy of the information therein (*se*e ¶¶ 53-55 above regarding these

false certifications and statements).   The Management Company's home office cost statements (CMS Forms 287) presented to Medicare were all signed by an "officer of the home office" (*i.e.*, the Management Company), including but not limited to Tommy Kuluz  (the Chief Financial Officer of the Management Company acting as an agent of the Hospital) and Starann Lamier (The Chief Operating Officer of the Management Company), and falsely certified to the truth and accuracy of the information therein (*see* ¶ 58 above regarding these false certifications and statements).

107.    The false certifications, reports, statements, and records, described herein were material to Medicare's decision to provide reimbursement to the Hospital and  had a natural tendency to influence and did influence those decisions.

## COUNT I

Claim By and on Behalf of the United States under the False Claims Act Against All Defendants -- Presenting False Claims, 31 U.S.C. § 3729(a)(1)(A) (claims from and after May 20, 2009) and  31 U.S.C. § 3729(a)(1) (claims up to and though May 19, 2009)

108.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 107 as though fully set forth herein.

109.    By virtue of the wrongful acts described herein, from 2002 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, presented, or caused to be presented, to Medicare false or fraudulent claims for reimbursement in violation of 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1) (pre-amendment).  In particular, Defendants presented and caused to be presented to Medicare false, fraudulent, misleading, and incomplete information in the Hospital's Medicare cost reports and the Management Company's home office cost statements.

110.    Medicare relied on these fraudulent cost reports and home office cost statements in determining the Medicare reimbursement rates and the amount of reimbursements to be paid to the Hospital, which resulted in the payment of millions more dollars to the Hospital than that to which it was legally entitled.

111.    The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions.

112.    As a result of the false claims presented, and/or caused to be presented, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented, or caused to be presented, and other monetary relief as appropriate.

## COUNT II

Claim By and on Behalf of the United States under the False Claims Act Against All Defendants -- Using False Records or Statements Material to False Claims, 31 U.S.C. § 3729(a)(1)(B)(for all claims)

113.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 107 as though fully set forth herein.

114.    By virtue of the wrongful acts described herein, from 2002 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, made, used, and/or caused to be made or used, false records, statements, and certifications material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).  In particular, Defendants made, used, and caused to be made or used, false records, statements, and certifications in the

41

Medicare cost reports of the Hospital and in the home office cost statements of the Management Company.

115.    Medicare relied on these fraudulent records, statements, and certifications in determining the Medicare reimbursement rates and the amount of Medicare reimbursements paid to the Hospital, which resulted in the payment of millions more dollars to the Hospital than that to which it was legally entitled.

116.    The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions.

117.    As a result of these false records, statements, reports, and certifications, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false records, statements, and certifications made to the Medicare program and other monetary relief as appropriate.

## COUNT III

Claim By and on Behalf of the United States under the False Claims Act Against All Defendants -- Failing to Refund Overpayments Owed to the Government, 31 U.S.C. § 3729(a)(1)(G) (claims from and after May 20, 2009) and 31 U.S.C. § 3729(a)(7) (claims up to and though May 19, 2009)

118.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 107 as though fully set forth herein.

119.    By virtue of the wrongful acts described herein, from 2002 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, received millions of dollars from Medicare to which they were not entitled and which they had an

obligation to refund, but Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, failed to return this wrongfully-obtained money to Medicare.  Defendants also concealed the false, misleading, and incomplete information included in the Hospital's Medicare cost reports and in the Management Company's home office cost statements, and never refunded, or offered to refund, any of the money wrongfully obtained.  These actions violated 31 U.S.C. § 3729(a)(1)(G) and 31 U.S.C. § 3729 (a)(7) .

120.    The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions.  In addition, Defendants' concealment of the false and fraudulent expenses impaired Medicare's ability to pursue refunds of the improperly paid amounts.

121.    As a result of these matters, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims, and other monetary relief as appropriate.

## **COUNT IV**

Claim By the United States Against All Defendants -- Unjust Enrichment

122.    This is a claim by the United States for unjust enrichment under the common law arising from the Defendants' unjust receipt of Medicare funds while engaged in the illegal conduct described herein.  This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

123.    The United States re-alleges and incorporates by reference paragraphs 1 through 107 as though fully set forth herein.

124.    By virtue of the wrongful acts described herein, from 2002 through the present, Defendants obtained Medicare funds to which they were not entitled.

125.     The false representations described herein were material to Medicare's decision to provide reimbursement and had a natural tendency to influence and did influence those decisions.

126.    Based on the foregoing, Defendants have been unjustly enriched, and the circumstances dictate that, in equity and good conscience, the money should be returned to the United States.

## **COUNT V**

Claim By The United States Against The Hospital Only – Payment By Mistake Of Fact

127.    This is a common law claim by the United States for payment by Medicare to the Hospital based on a mistake of fact.  This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

128.    The United States re-alleges and incorporates by reference paragraphs 1 through 107 as though fully set forth herein.

129.    By virtue of the wrongful acts described herein, from 2002 through the present, Defendant Hospital obtained and kept Medicare funds to which it was not entitled by overbilling Medicare and by not reimbursing Medicare for the overpayments.

44

130.    The false representations in the Medicare cost reports described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions.

131.    Based on the foregoing, Medicare mistakenly overpaid the Hospital, and the circumstances dictate that, in equity and good conscience, the amount of these overpayments should be returned to the United States.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States demands and prays that judgment be entered in its favor and against Defendants, jointly and severally, as follows:

1.    On Counts I - III, under the False Claims Act, 31 U.S.C. 3729 *et seq*., against all Defendants for treble the amount of the United States' actual damages, plus civil penalties as are allowable by law for each false claim or record;

2.    On Count IV against all Defendants for the amounts by which the Defendants were unjustly enriched, plus interest, costs, and expenses, and for all such other relief as the Court deems equitable;

3.    On Count V against Defendant Hospital for the amount by which the Hospital was overpaid by Medicare, plus interest, costs, and expenses, and for all such other relief as the Court deems equitable;

4.    For all costs of this civil action; and

5.    For such further relief as the Court deems just and proper.

Respectfully submitted,

BENJAMIN C. MIZER
PRINCIPAL DEP. ASST. ATTORNEY GENERAL
CIVIL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

Michael D. Granston
Daniel R. Anderson
A. Thomas Morris
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-3345


GREGORY K. DAVIS
UNITED STATES ATTORNEY


*/s/ Angela Givens Williams*
ANGELA GIVENS WILLIAMS
ASSISTANT UNITED STATES ATTORNEY
501 E. Court Street, Suite 4.430
Jackson, Mississippi  39201
Telephone No.: 601/965-4480
Facsimile No.: 601/965-4409
MS Bar Number 102469
E-mail: angela.williams3@usdoj.gov


ATTORNEYS FOR THE UNITED STATES


Dated:  December 4, 2015

46

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 4, 2015, a true and correct copy of the foregoing FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF has been filed with the Clerk of the Court, which sent notice to the following counsel:

Counsel for Defendants:

Caryn Milner, Esq,.
COPELAND, COOK, TAYLOR & BUSH, P.A.
1076 Highland Colony Parkway
600 Concourse, Suite 100
Ridgeland, MS 39157

Ronnie Musgrove, Esq.
MUSGROVE & SMITH PLLC
1635 Leila Drive
Suite 104
Jackson, MS 39216

Counsel for Relator:

Clifford Johnson, Esq.
PIGOTT & JOHNSON
775 N. Congress Street
Jackson, MS 39202

I HEREBY FURTHER CERTIFY that a true and correct copy of the foregoing FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF, along with a summons, will be served upon  the following individuals (through counsel who has agreed to accept service for them):

Thomas Kuluz
6900 Orchard Road
Ocean Springs, MS 39654

Starann Lamier
5062 Silver Ridge Drive
Kiln, MS 39556

*/s/Angela Givens Williams*
ANGELA GIVENS WILLIAMS

47